# Supreme Court of Florida

_____

No. SC15-1991

_____

## IN RE: CERTIFICATION OF NEED
## FOR ADDITIONAL JUDGES.

[November 19, 2015]

PER CURIAM.

This opinion fulfills our constitutional obligation to determine the State's

need for additional judges in Fiscal Year 2016/2017 and to certify our "findings

and recommendations concerning such need" to the Legislature.[1] Certification is

"the sole mechanism established by our constitution for a systematic and uniform

---

1. Article V, section 9 of the Florida Constitution provides in pertinent part:

> **Determination of number of judges.**—The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts and judicial circuits. If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need.

assessment of this need." <u>In re Certification of Need for Additional Judges</u>, 889 So. 2d 734, 735 (Fla. 2004). In this opinion, we are certifying a need for twenty-four trial court judges and none in the district courts of appeal as further elaborated below.

## TRIAL COURTS

The Florida Supreme Court continues to use a weighted caseload system as a primary basis for assessing judicial need for the trial courts.[2] Using objective standards, this Court has examined case filing and disposition data, analyzed various judicial workload indicators, applied a three-year average net need, and considered judgeship requests submitted by the lower courts. Applying this methodology, this Court certifies the need for twenty-four judgeships statewide, one of which is in circuit court and twenty-three in county court as detailed in the attached appendix.

As Florida's economy gradually improves, we recognize that competing demands for state funding persist across state government. We also note that during the recession and in the post-recessionary period the judicial branch has had no increase in the number of trial court judges since 2007, despite a documented need. Nonetheless, our judges and court staff continue to work diligently to

2. Our certification methodology relies primarily on case weights and calculations of available judge time to determine the need for additional trial court judges. <u>See</u> Fla. R. Jud. Admin. 2.240.

administer justice, promptly resolve disputes, and ensure that children, families, businesses, and all who come before Florida's courts receive the judicial attention their cases require.  To serve these needs, our trial courts continue to be innovative in their delivery of justice by expanding problem-solving approaches to differentiated case management such as drug courts, elder courts, mental health courts, and veterans' courts.[3]  Recently, several trial court chief judges advised this Court of their efforts to further address juvenile issues through innovative approaches to girls' courts and early childhood courts.  On the civil side, several of our trial courts have implemented business courts to expedite complex business cases.

## CIRCUIT COURT WORKLOAD

Our most recent analysis of circuit court statistics from Fiscal Year 2013/2014 and preliminary data from Fiscal Year 2014/2015 indicates variability in filings by case type.  For example, statewide our courts have seen a one percent increase in probate filings and a nine percent increase in dependency filings.  As Florida's demographics evolve, we will continue to closely monitor any upward filing patterns and the potential impact of emerging trends on judicial workload.  Conversely, circuit civil filings (excluding real property/mortgage foreclosures)

---

3. Other problem-solving docket types operational in select circuits include truancy court, domestic violence court, child support enforcement court, homelessness court, teen court, and community court.

declined by four percent, while domestic relations, felony, and juvenile delinquency filings were down for the same period between one and three percent.

Similar downward filing trends are occurring nationally, and we continue to closely monitor and analyze this phenomenon throughout the state as the number of filings by case type relates to judicial case weights and significantly influences workload analysis. Over the last several years, we have statistically controlled[4] for the foreclosure crisis in our judicial workload forecasts. Our analysis indicates that, statewide, foreclosure filings appear to have stabilized and are even below pre-recession levels. Some circuits, like the Ninth Circuit, Eleventh Circuit, and Seventeenth Circuit, continue to report approximately 600 foreclosure filings each month. We will continue to closely monitor these filing trends to determine if additional resources such as senior judge days are needed to address this workload.

Notwithstanding decreased filings in most categories, our three-year average net need analysis continues to indicate that one additional judgeship is necessary in the Fifth Judicial Circuit. This three-year average net need reflects sustained workload over a multi-year period. The Fifth Circuit continues to be one of the fastest growing areas of the state with a corresponding workload increase. Consistent with this growth are a high number of court interpreting events and a

4. The term statistically controlled means to purposefully not factor growth into a statistical forecast because its incorporation may inflate or distort the accuracy of the forecast.

significant increase in self-represented litigants, both of which lead to delays in case processing and the need for more judicial time. The circuit is also geographically large requiring circuit judges to spend time traveling between counties, which reduces their availability.

Several chief judges have also expressed concerns about the continuing accuracy of the current case weights used by this Court to evaluate judicial workload. They believe that the weights must be revisited and updated to portray a complete picture of case complexity confronting trial court judges throughout the state. Indeed, it has been eight years since the case weights were last adjusted. During that period, we experienced the recession, a reduction in force to our staff, and the mortgage foreclosure crisis. We share the chief judges' concerns that the time has come to reevaluate the current case weights and before this year's certification analysis began we directed our staff to conduct a comprehensive Judicial Workload Study, which commenced in January of 2015 and is expected to conclude in late spring 2016. We anticipate being able to use revised case weights in our 2016 certification opinion. (This workload study is discussed later in this opinion.)

Our judges continue to absorb the work previously performed by case managers, law clerks, magistrates, and other supplemental support staff lost in the

budget reductions of recent years.[5]  Most of these positions provided direct case management, legal research, and adjudicatory support to the judges.  The consensus among chief judges is that loss of support staff translates into slower case processing times, congested dockets, and long waits to access judicial calendars.

Other factors identified by the chief judges that increase trial court workload include increases in the number of motions and hearings, complex cases such as tobacco cases, and higher jury trial rates.  Crowded dockets in many circuits translate into delays in obtaining hearing times.  Complex cases require a great deal of judicial labor, and go to trial more frequently than other cases.  When they do, all other cases on a judge's docket become delayed, which creates a cascading delay effect for those parties seeking justice.  Frequently, lengthy jury trials must be scheduled months in advance.  Judges continue to report to their chief judges that they are increasingly challenged to devote adequate time to hearings due to increased volume.  Case complexity, more and lengthier hearings, and crowded dockets all contribute to court delay.

---

5. When the case weights were originally developed in 1999 and updated in 2007, they incorporated the availability of supplemental resources to assist judges with case processing matters.  It is reasonable to conclude that the loss of these supplemental positions (i.e., case managers, law clerks, and magistrates) may increase the case weights if not restored prior to the next case weight update.

Our trial courts have made significant headway towards reducing the overall backlog of foreclosure cases associated with the mortgage foreclosure crisis. For example, from Fiscal Year 2012/2013 to May 2015, the foreclosure backlog was reduced by over seventy-three percent. Monies from the national mortgage foreclosure settlement[6] appropriated by the Legislature for senior judges, magistrates, and case managers to address this crisis have made a significant difference in reducing the foreclosure backlog throughout the state. We continue to monitor the progress of this backlog for each circuit and regularly communicate with the chief judges to identify issues that might be increasing disposition times in their circuits.

## COUNTY COURT WORKLOAD

As with circuit court work, county court workload remains high with unmet judicial need holding steady. Preliminary data for Fiscal Year 2014/2015 indicates a three percent increase in the county civil division filings when compared to Fiscal Year 2013/2014. This growth is driven by small claims filings, which experienced an increase of more than 16 percent. In some counties, chief judges report that DUI cases are increasing county court workload. In many circuits, county court judges are also assisting with circuit court workload. Their contribution in circuit court may be further evidence that the case weights for

_____

6. This program is commonly known as the Foreclosure Backlog Reduction Initiative.

circuit court are outdated.  We anticipate the Judicial Workload Study being dispositive of this issue.  The loss of civil traffic infraction hearing officers in county court, coupled with added workload associated with new legislation, continues to increase county judge workload.  These factors, among others, contribute to such a high county court judicial need.

## SELF-REPRESENTED LITIGANTS

Additionally, self-represented litigants who are frequently unprepared for the rigors of presenting evidence, following rules of procedure, and generally representing themselves in court also create additional work for trial judges. Increased judicial involvement in these cases where one or more parties represent themselves entails lengthier hearings, rescheduled hearings, and court delay.  The impact of self-represented litigants occurs in both circuit and county court.  To more fully assess this impact and address this need, along with other court access concerns, this Court has initiated the above-referenced Judicial Workload Study and appointed a Commission on Access to Civil Justice, both of which are discussed more thoroughly below.

**JUDICIAL WORKLOAD STUDY**

We are now eight years removed from updating the case weights used by this Court to evaluate judicial workload in the trial courts.[7] Consistent with the original recommendations of the 1999 Workload Study, judicial case weights should ideally be updated every five years. Accordingly, in early 2015 the Office of the State Courts Administrator began updating all of the trial court case weights. This is a statewide effort involving all trial court judges.

This workload assessment is comprehensive and will be carefully validated. A significant enhancement to this study is that it will include an assessment of the contributions of all quasi-judicial officers such as senior judges, magistrates, child support enforcement hearing officers, and civil traffic infraction hearing officers. As with previous workload studies, the Legislature is fully apprised through the inclusion of its Office of Program Policy and Government Accountability in the process. Oversight of this initiative is being conducted by the Court Statistics and Workload Committee of the Commission on Trial Court Performance and Accountability. As with previous studies, we have contracted with the National

---

7. See Judicial Resource Study conducted in Fiscal Year 2006/2007, available at http://www.flcourts.org/core/fileparse.php/260/urlt/JRSReport_final.pdf.

Center for State Courts[8] to conduct the study with in-kind assistance from the Office of the State Courts Administrator. The study began in February 2015 and is expected to conclude by the summer of 2016.

## COMMISSION ON ACCESS TO CIVIL JUSTICE

In response to a variety of concerns, and in particular the legal needs of those with low and middle income or who are disadvantaged, as well as the concomitant increasing demands placed on the judicial branch by self-represented litigants, this Court issued In re Florida Commission on Access to Civil Justice, Fla. Admin. Order No. AOSC14-65 (Nov. 14, 2014),[9] creating a commission on access to civil justice. The commission was:

> established to study the remaining unmet civil legal needs of disadvantaged, low income, and moderate income Floridians. [Among other items], the commission is charged with considering Florida's legal assistance delivery system as a whole, including but not limited to staffed legal aid programs, resources and support for self-represented litigants, limited scope representation, pro bono services, innovative technology solutions, and other models and potential innovations.[10]

---

8. Staff of the National Center for State Courts are considered subject matter experts in evaluating judicial workload and have conducted similar workload studies in many states throughout the country. See http://www.ncsc.org/workload-assessment.

9. The administrative order is available at http://www.floridasupremecourt.org/clerk/adminorders/2014/AOSC14-65.pdf.

10. Id.

- 10 -

It is our hope that through this commission the needs of self-represented litigants will be systemically identified and can ultimately be addressed, thereby allowing judges to devote their time to providing and administering justice in a more efficient and effective manner.

## DISTRICT COURTS OF APPEAL

We are not certifying a need for district court judges during this certification cycle, since our review, applying the current relative case weights methodology, indicates adequate resources. As part of our five-year review cycle of the relative case weights used by this Court to evaluate district court judicial need, district court judges provided direct feedback on the case weights. Revised case weights are currently under consideration by this Court. If approved, we will apply those revised weights during next year's judicial certification process.

## CONCLUSION

We have conducted both a quantitative and qualitative assessment of judicial workload. Using the case-weighted methodology and the application of other factors identified in Florida Rule of Judicial Administration 2.240, we certify the need for twenty-four additional trial court judges in Florida, consisting of one in circuit court and twenty-three in county court, as set forth in the appendix to this opinion.

We appreciate the legislative appropriation to address the backlog of foreclosure cases throughout the state. The monies provided for senior judges, magistrates, case management, and technology made a significant difference in the court system's ability to reduce the overall backlog of pending foreclosure cases. We are pleased to note that statewide, foreclosure filings are now below their pre-recession level. We continue to closely monitor both the downward filing trends for multiple trial court divisions and the increase in filings in two case types noted previously. These factors, and others, will be carefully documented in our current Judicial Workload Study.

Although constitutionally required to certify judicial need, we remain mindful of competing funding needs both elsewhere in state government and within the judicial branch. On balance, we have determined that highest priority should go to those critical issues included in the Judicial Branch's Fiscal Year 2016/2017 Legislative Budget Request.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

Original Proceeding – Certification of the Need for Additional Judges

## APPENDIX
## Trial Court Need

| Circuit | Circuit Court Certified Judges | County | County Court Certified Judges |
|---|---|---|---|
| 1 | 0 | N/A | 0 |
| 2 | 0 | N/A | 0 |
| 3 | 0 | N/A | 0 |
| 4 | 0 | Duval | 1 |
| 5 | 1 | N/A | 0 |
| 6 | 0 | N/A | 0 |
| 7 | 0 | N/A | 0 |
| 8 | 0 | N/A | 0 |
| 9 | 0 | Orange | 1 |
| 10 | 0 | N/A | 0 |
| 11 | 0 | Miami-Dade | 7 |
| 12 | 0 | N/A | 0 |
| 13 | 0 | Hillsborough | 7 |
| 14 | 0 | N/A | 0 |
| 15 | 0 | Palm Beach | 2 |
| 16 | 0 | N/A | 0 |
| 17 | 0 | Broward | 4 |
| 18 | 0 | N/A | 0 |
| 19 | 0 | N/A | 0 |
| 20 | 0 | Lee | 1 |
| **Total** | 1 | **Total** | 23 |